338 *THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, plaintiff in error, v. CATHARINE A. PATERSON, defendant in error.

(Atlanta, June Term, 1870.)

INSURANCE—APPLICATION—GOOD FAITH—MISREPRESENTATIONS.—The utmost good faith is required in an application for a life insurance, and any misrepresentation of facts affecting the nature or extent of the risk voids the policy.

SAME—MISREPRESENTATION — KNOWLEDGE OF FALSITY NECESSARY TO AVOID POLICY.—When one, as the agent of his reputed wife, represented to an insurance company that she was his wife, and affected an insurance upon his own life in her name, as her agent, for her benefit, and the truth of the case was, that the marriage was void by reason of the reputed wife having a former lawful husband living at the time of the second marriage:

*Held*, that the policy is not void by reason of the illegality of the last marriage, unless it further appears that the said deputed husband and wife knew, at the time the policy was effected, that at the time of their supposed marriage the lawful husband of the wife was living, and the marriage illegal, and failed to inform the company of the fact.

SAME—SUICIDE AS AVOIDING POLICY—INTENT TO DESTROY LIFE MUST EXIST.*—When in a life insurance policy

*INSURANCE—INSURABLE INTEREST.—In Union Fraternal League v. Walton, 109 Ga. 7, 34 S. E. Rep. 317, Little, J., delivering the opinion of the court, said: "We think also that this court has recognized the doctrine for which we are contending, in the case of Equitable Life Assurance Society v. Paterson, 41 Ga. 338, where McCay, J., declared that the law which prohibits the insurance of a life by another who has no interest in the continuance of that life, is founded on a sound public policy, and that it was intended to prevent gaming policies and to avoid that inducement to crime which would exist if it were permitted. In the case then under consideration it appeared that a woman who contracted marriage had at the time a living husband, making, of course, the last contract of marriage void. While living together under such void marriage the supposed husband procured a policy of insurance on his life in favor of the woman with whom he was then living. Payment of the policy was resisted on the ground that she had no insurable interest in the life of the person insured. This court there held that such a contract of insurance did not come within the reason of the law, which prohibited gaming policies, nor was it open to the objection that it offered an inducement to crime." But Lumpkin, P. J., dissenting, said: "The question at issue was neither made in, nor passed upon, by this court in the case of Equitable Life Assurance Society v. Paterson, 41 Ga. 338. It is true the report of that case discloses that in the request to charge made by counsel for the defendant, that this question was presented to the trial judge for his determination; but the motion for a new trial, the denial of which was the only ruling excepted to, did not in the remotest manner invoke a decision of the question whether one can take out a valid policy of insurance on his own life for the benefit of a stranger; nor is any such question dealt with in the syn-

there was an exception, that the company was not to be liable if within two years the assured should die by his own hand:

*Held*, that if the assured drank to intoxication, and while in this condition, by accident or mistake, took an overdose of laudanum and died therefrom, this is not a dying by his own hand in the sense of those words as used in the policy, even though the mistake or accident be in some sense occasioned by the drunkenness; but if he took the laudanum with intent to destroy his life, though it be but the intent of a drunken man, this is a dying by his own hand.

Insurance. Marriage. Charge of Court, etc. Before Judge Schley. Chatham Superior Court. April, 1870.

In August, 1868, Catharine A. Paterson averred that, on the 26th of February, 1867, she caused to be made a policy of insurance by the Equitable Life Assurance Society of the United States, a corporation, by which, in consideration of the representations made to said society, in the application for such policy and statements therein made, touching the person and family of the assured, submitted by the assured, and of $136 30 paid by her to said society, and of the like sum to be paid semi-annually, on or before the 26th of August and February, in each year, during the life of the assured, the society assured the life of her husband, James F. Paterson, *for $10,000 00, for her sole use, with participation in profits during his life. This sum was by the policy to be paid to her within sixty days after her husband's death, upon due notice and proof. Among the stipulations in said policy were, that it should be void "if the assured shall die by his own hand, within two years from the date of said policy," "or if the declarations made in the application for said policy, or if any statement respecting the person or family" of the assured, "should be found in any respect untrue." On the 16th of May, 1868, the assured died, of which notice and proof were made on the 1st of June, 1868, as required by the policy. All that was necessary to be done and to be avoided, to make the case against the company was averred. Another count did not aver that Paterson was her husband. Another, made the same omission, and also omitted the averment as to representations made to the society, before the policy was issued. She concluded with counts for money had and received, money laid out and expended, etc. In each she claimed $10,000 00 besides interest.

The society pleaded the general issue; that in said appli-

opsis of the points decided which, under our statute, is the official announcement of the decision rendered. Accordingly the remarks of Judge McCay upon the subject of insurable interest should be treated as merely obiter, and in no sense binding as authority."

·SAME—SUICIDE—INSANITY.—The act of self destruction by a person who is insane at the time and without fault on his part, is not suicide in any proper sense if the insanity be of such character and degree. as to free the act from all immorality and leave the actor entirely blameless. Life Insurance Ass'n of America *v.* Waller, 57 Ga. 533, citing the principal case.

cation Paterson was represented as a married man, whereas he was not; that plaintiff was not Paterson's wife, as was therein stated, but was 'the wife of one John H.. Talbird, but had undertaken to marry Paterson, and was living with him under such circumstances as that, had they been fully disclosed, the policy would not have been issued, yet she and Paterson fraudulently concealed these circumstances from the society; that on the 11th of December, 1863, she and Paterson had procured the passage of a private Act, relieving them from the penalties of marrying while said Talbird was alive, representing that they then supposed him to be dead, and yet this was also fraudulently concealed from said society; that she had no interest in Paterson's life; had it been known the policy had not been issued. Further, she was faithless to Paterson, drove him to desperation, because of her discovered infidelity, and he had determined to separate from her, consulted counsel, and was in the act of such separation just before his said death. Further, Paterson took poison *from some person. unknown, his death was by poison, which she knew he had taken voluntarily, and yet, being present and intending to let it have full effect, she refused and neglected to call medical aid, whereby his death occurred. More, she assisted him in taking said poison, she administered it to him; and for these reasons this society said that the policy was void.

On the trial, plaintiff read in evidence the said policy, which was drawn in favor of "Katie A. Paterson, wife of" said Paterson; the certificate of a minister showing her marriage with Paterson, in 1860; showed by a witness that Paterson introduced her to him as his wife, that Paterson died on the day alleged, and that notice and proof were made, as required by the policy, that payment of the $10,000 00 was demanded and refused, and closed.

The defendant's agent, who had issued the policy, testified that this policy was based upon the application shown to him, and that had it been known that plaintiff and Paterson did not sustain to each other, at the time, the legal relationship of man and wife, the policy would not have been issued.

Cross-Examined he said: "I first heard doubts expressed as to whether Dr. P. and plaintiff were husband and wife, after the death of the former. If I had known that such doubts existed at the time of the issuing of the policy, I might, òr might not, have recommended it to issue. The company, in my opinion, would not have issued it. I do not know the laws of the State of Georgia as to what constitutes the legal relation of husband and wife. The company so far recognize my acts as generally to issue the policy on my recommendation; but they would correct any errors. As a general thing, they acknowledge as binding what I do. I canvassed Dr. Paterson heavily to induce him to take out the policy."

The application was then put in evidence, containing the following stipulation: .

"The undersigned, whose life is herein proposed for Assurance, hereby declares that the answers to the questions herein are fair, full and true answers to said questions, and it is distinctly stipulated and agreed by said applicant, that the said answers and the statements herein shall form the basis *of the proposed contract of assurance, and that any untrue or fraudulent answers or statements, any suppression of facts respecting his (or her) health or family history, or neglect to pay the premium on or before the day it becomes due, shall render all policies issued under or by reason of this application, and all dividends thereon, null and void, and forfeit all payments made thereon, and that said proposed assurance shall not be binding until the first premium shall have been received by said society, or an authorized agent thereof, during the lifetime and good assurable condition of said applicant."

It contained also the following questions and answers by James T. Paterson:

"5. Are you married? Yes. Have your habits of life always been correct and temperate? Yes."

"10. What is your custom respecting the use of ardent spirits, malt liquors or wine? Use them very rarely."

"20. What is the relationship, or interest in you, of person named? Wife."

"18. In whose favor is the policy to be drawn? (Name in full.) Katie A. Paterson."

And the following question and answer in the medical examiner's report:

"11. Do you believe the person to be entirely sober and temperate in his habits of life? They are."

And the following in certificate of friend:

"2. Are his habits of life entirely correct and temperate? Yes."

"Are his habits and health such, in your opinion, as to render his life safely assurable? Yes."

The application was signed at Savannah, "this 21st day of February, 1867, by

James T. Paterson,<br>for .<br>Katie A. Paterson.

Witnesses by L. Bowie. Approved and recommended by L. Bowie, Agent."

To show that John H. Talbird was alive when plaintiff *married Paterson, in 1860, and that she knew it at the time of her marriage, the defendant introduced the following evidence: A record by which it appeared that

in 1869, she filed in New York a libel for divorce against him, swore to the facts stated, had him served personally, in Alabama, and obtained a divorce from him. An Act of the General Assembly of Georgia, passed in 1863, relieving her and Paterson from the pains and penalties of living together upon the ground that they married supposing Talbird was dead, but had since doubts as to that fact. In 1863 and 1864, Paterson, at her instance, made two wills, giving her property, (as a witness said) that it might not be inherited by Paterson's brother.

One witness testified that Talbird was alive and in Augusta trying to get his child from plaintiff, while she and Paterson were there living together. Another saw Talbird in 1865, and another in 1862 or 1863. Talbird testified that they parted in 1859, in Alabama, he had left there for about two years and returned in 1864, and had lived there ever since; she wrote to him in 1863, and he did go to Augusta for the child, but did not see or communicate with plaintiff. She came to Augusta on their separation, taking the child with her. It was shown that during this absence of Talbird, he was reported dead; but the witnesses stated facts going to show that the report was fabricated and given currency to by plaintiff and Paterson.

It was shown that Paterson died from the effects of laudanum taken about twelve o'clock at night, that no physician was called in till about eleven o'clock of the next morning, and that he died about noon. The circumstances as detailed by her, her conduct at the death, at the burial, and afterwards, Paterson's declaration that she was unfaithful to him and that he had quited her, on the day before the death, and that he reurned only to get something which he had left, etc., etc., were put in evidence, to show that she either gave him the laudanum or suffered him to take too much, and carelessly or wickedly prevented medical assistance, till his death from laudanum was inevitable. And it was shown that she *was indicted for murdering Paterson; and circumstances to prove that she was faithless to him with one Roher, and others, were shown. There was evidence to show that he was a temperate man. In rebuttal, other witnesses testified as to the manner of plaintiff and circumstances to relieve her from the suspicion of carelessness, wickedness or unchastity as to Paterson. She testified to facts tending to how her perfect innocence, that the death was by over dose of laudanum, by accident taken, when Paterson was drinking, weak, and nervous, and sleepless, etc. She produced and read many letters from Paterson, in which he addressed her very tenderly as his wife. And she stated that she did believe Talbird was dead when she married Paterson, and that her belief was founded upon circumstances detailed by her, and not of her making, etc. It was shown, that she was ready to be tried for murder, but the State not being ready nor willing to go to trial, upon the terms placed upon them by the Court, the bill was

nol prossed. Roher explained his connection with the parties, etc., etc., and said Paterson was drunk that night. Upon the close of the testimony, which was very lengthy, and pro and con, on all the questions made, the defendant's counsel requested the Court to charge the jury as follows:

"1. That the policy of assurance, placed in evidence by the plaintiff, is void, from the want of such an insurable interest as is required by the law of Georgia, and there can be no recovery upon it.

2. That if, in taking out and continuing the policy of assurance, James T. Paterson transacted the business for the plaintiff, she is bound by his acts and declarations in connection therewith, as her agent.

3. That they (the jury) cannot bring in a verdict for the plaintiff, unless they find that her interest in the life of Dr. Paterson was such as he represented it to be, and (interest and relationship are to be regarded as convertible terms,) that any concealments or misrepresentations as to the true character of that relationship, which in any wise effected the risk of the insurer, violated the policy, and there can be no recovery upon it.

*4. That the language of the policy incorporated into itself the application upon which it was based, making all the statements of the latter covenants of warranty upon the part of the plaintiff that they should be in all respects strictly true; and that if the evidence shall have shown any misstatement whatsoever, or any suppression of a qualifying fact, in the application, whether resulting from design or from ignorance, whether affecting the risk or not, the policy was made void thereby, and they (the jury) must bring in a verdict for the defendant.

5. That when, in answering the question: "What is the relationship, or interest in you of person named?" Dr. Paterson replied, "wife," it must be understood he meant "wife" in the full sense of the term as used by the law, without any qualification whatsoever; and that no other relationship, howsoever near or dear, can be substituted for it. If the evidence shall show that the plaintiff was not the lawful wife of deceased, the jury must bring in a verdict for the defendant.

6. That no woman can be the lawful wife of two living husbands; and that if a married woman, while her husband still lives, shall undertake to contract marriage with another man, such contract is void; and it is wholly immaterial whether she undertake to make it from fraud or ignorance.

7. That, if they (the jury) shall find that Dr. Paterson came to his death from the effects of poison administered by his own hand, whether with a rational or maudlin intent to destroy his own life, or from the effect of intoxication, displacing the capacity to intend, he committed suicide, and, under the laws of Georgia, the plaintiff cannot recover upon this policy.

8. That, if they shall find that Dr. Paterson came to his death by his own hand, in the administration of poison, or through any agency whatever, within two years from the date of the policy, the plaintiff cannot recover upon it.

9. That, if it shall appear from the evidence that the poison was administered by the plaintiff, or by any one in her presence, with her knowledge, whether such person was Dr. *Paterson or not, she cannot recover in this action; and that, in order to reach this conclusion, it is not necessary to find her guilty of an indictable offence, or guilty of murder beyond a reasonable doubt; but that this being a civil cause, their verdict must follow the preponderance of the evidence.

10. That, if they shall find that Dr. Paterson took the poison by mistake, the mistake originating in a mind enfeebled or beclouded by drink, and leading him to pour out laudanum by a dim gas-light, and into a goblet, in such quantity as produced death, he was guilty of gross negligence, and the plaintiff cannot recover.

11. That, if they shall find that the plaintiff was present when Dr. Paterson, in such condition, and under such circumstances, swallowed the poison, and shall find further that, when the results of the poison grew to be apparent, she failed to call in such medical aid as might have saved his life, she was guilty of gross negligence, and they must bring in a verdict for the defendant.

12. That a stricter good faith as to representations and concealments should be required in mutual insurances than in any other similar contracts. Code, 2798. "Every application for insurance must be made in the utmost good faith, and the representations contained in such application are considered as covenanted to be true by the applicant. Any variation by which the nature or extent or character of the risk is changed will void the policy." Code, 2760. And that this law refers to all contracts of insurance. even where the application is not made a part of the policy itself.

13. That, if the jury shall be satisfied from the evidence that there was a conspiracy between the plaintiff and Edward A. Roher, or any other person or persons, to secure the payment of the insurance money, whether by destroying the life of James T. Paterson, or by concealing the real causes or significant circumstances of that death, or by any act or declaration looking to any circumstances or relationship in life of the plaintiff, whether existing before or after the undertaking by her to contract marriage with Paterson, then all the acts and declarations of Edward A. Roher, and of such *other person or persons looking to that end, are to be regarded as the acts and declarations of the plaintiff herself.

That if the jury be satisfied that the plaintiff has been guilty of gross negligence, either by herself or by her agents,

she cannot recover upon this policy, even though they (the jury) should recognize no evidence of criminality either in her or her agents. Code, 2759.

14. That the application, being part of the policy, constitutes the contract between the insurer and the assured, so far as its contents are concerned, and that, even if the agent of the defendant in Savannah knew the peculiar relationship existing between the plaintiff and James T. Paterson, yet, if the evidence shall show that it was not the full and legal relationship existing between husband and wife, the policy is void, and the jury must bring in a verdict for the defendant.

15. That, if a married man die in Georgia, leaving no children, his wife is his sole heir, and takes all of his property.

16. That, if James T. Paterson had come to his death by the hand of John H. Talbird, because of the relationship between Paterson and Talbird's wife, plaintiff could not have recovered.

The Court charged the jury as follows: "This is an action brought by Catherine A. Paterson against the Equitable Life Insurance Company, of New York, for the recovery on a life policy for the sum of $10,000 00 taken on the life of her husband, James T. Paterson, for her benefit.

It is conceded by both counsel that such a contract, under the laws of Georgia, can be made, and that a husband can take out a policy for the benefit of his wife. Then we must see if, from the pleadings, such a contract was made between the assurer and James T. Paterson. If so, then to make the Company responsible, you must find that the assured has complied with whatever conditions were imposed by the contract, such as paying the premiums, and, after the death of the party upon whose life the policy was taken, according to the regulations of the Company, the furnishing of the proper notice, and due proof thereof; or, in other words, whatever *was imposed on the plaintiff by the contract, as executory, or a condition precedent to the contract, you must find to have been performed by the plaintiff, before the Company can be liable. The conditions upon which this policy was obtained have been stated in your hearing; it is not necessary for me to repeat them. There is prima facie evidence that these conditions have been complied with, because the contract is made, the policy is in Court, and the action is brought upon it.

I will premise by stating that all the statements of the assured at the time of making the contract, in his application for insurance, are presumed to be true until the contrary is made to appear. That is to say, it is not necessary to a recovery by the plaintiff that she should show that all or any of the statements made by the assured in answer to the questions propounded to him at the time of making the con-

tract, were true; for, being accepted by the Company, the presumption is they are true, till the contrary is shown. But the defendant, when the action is brought, comes in, and, in its plea, denies that certain of those statements are true, and says that, therefore, the policy is void. This brings us to the consideration of the legal points raised by the defendant. But before proceeding to consider them, I charge you, as requested by the defendant's counsel, that the plaintiff is bound by the acts and statements of James T. Paterson, just as much as if they had been made by herself, he being her agent in securing this insurance.

The first point made by the defendant is that the assurer made a false representation to the defendant, in stating that the plaintiff was his wife. Upon this point, therefore, I charge you, as requested by the defendant, that you must find that, in fact and law, the plaintiff was the wife of the defendant; and if you fail to find this fact, the plaintiff cannot recover, because it was the right of the Company to know the true relationship existing between the plaintiff and the assured. For had she been nothing more than a concubine, in fact, and the assured represented her as his wife, in law, it would have been such a false representation as would *avoid the policy. Now, here the question arises, were Paterson and his wife legally married? This is one of the main points in this case. It is conceded that it is a Georgia contract. Then, what is the law of Georgia on the effect of this second marriage by the plaintiff?

On this point I charge you that, whatever may have been the criminal consequences to the plaintiff, for contracting this second marriage, yet, for many purposes, the marriage was valid until annulled. For instance, suppose the plaintiff had purchased necessaries without the consent of Paterson, and he had refused to pay for them, and he had been sued, he could not have set up successfully the plea that the plaintiff was not his wife. Again, had there been children born to them, such issue would not have been illegitimate. Now, while it is true that the law forbids a second marriage by a person who has a husband or wife living, yet there are even exceptions to this rule, as in the case of absence for seven years, and no tidings received of such absentee— such a marriage would be valid until annulled by a decree of a competent Court. For all civil purposes, a marriage between persons within the prohibited degrees of consanguinity is good until the parties are divorced, and as the Code gives this disability, that is, such blood relations, as one of the three disabilities in reference to the marriage contract, it must follow that the marriage of one already married is valid until a judgment of divorce is granted. Therefore, if you find, under the testimony, that Paterson and the plaintiff were united in marriage according to the requirements of the law in Georgia, and that they lived together as man and wife for a number of years, I charge you, that the representations made by Paterson to the defendant, that the plaintiff

was his wife, was not such a false representation as avoids the policy and contract between Paterson and the defendant.

The next point raised by the defendant, and a very important one also, is, that the policy is void because the deceased came to his death by his own hand, or by the act of the plaintiff. I charge you, that if either fact be found true from the testimony, the plaintiff cannot recover. I further *charge you, that if he died by his own hands, it is not necessary for you to find a felonious self-destruction. It will be sufficient if you find that the act was committed voluntarily, when Paterson had sufficient powers of mind to either do the actor to abstain from doing it. If you find from the evidence that Paterson, impelled by any cause, whether domestic unhappiness, or financial trouble, or both, voluntarily, and with sufficient reason to know the consequences of the act, took a quantity of laudanum sufficient to destroy life, that would be such a self-destruction as would avoid the policy.

I have had some ten or twelve requests made by the defendant's counsel. I think I have charged, substantially, up to the seventh. In the seventh, I am requested to charge the jury that, if you find that Dr. Paterson came to his death from the effects of poison administered by his own hand, whether with a rational or maudlin intent to destroy his own life, or from the effect of intoxication displacing the capacity to intend, he committed suicide, and under the law of Georgia the plaintiff cannot recover upon this policy. So I charge you.

Eighth. The charge, as requested, I will read, and then charge with a modification, "That if they shall find that Dr. Paterson came to his death by his own hand, in the administration of poison, or through any agency whatever, within two years from the date of the policy, the plaintiff cannot recover upon it." I charge that, if you find that Dr. Paterson came to his death by his own hand (in the intentional administration of poison) or through any agency whatever, used by himself with such intention, within two years from the date of the policy, the plaintiff cannot recover. The policy expresses that if he committed suicide within two years of its date there could be no recovery. That is part of the contract.

Ninth. "That if it shall appear from the evidence that the poison was administered by the plaintiff, or by any one in her presence, (with her knowledge) whether such person was Dr. Paterson or not, she cannot recover in this action; and *that, in order to reach this conclusion, it is not necessary to find her guilty of an indictable offence, or guilty of murder beyond a reasonable doubt; but that this being a civil cause, their verdict must follow the preponderance of the evidence." I cannot charge you in the language requested, but charge you in the following language: If a

dose of poison was administered by the plaintiff, Catherine A. Paterson, or by Dr. Paterson himself, or any one else, with a knowledge on his part that it was taken, not simply as a medicine, but as a poison, then she cannot recover. I charge you further, it is not necessary for you to find such facts as would make the plaintiff technically guilty of murder; that is, such as would be necessary for you to find if she was on trial for the crime of murder. For instance, if you should find from the testimony that the plaintiff had every reason to believe that a dose of laudanum or other poison, administered by a third person, or taken by Dr. Paterson himself, would probably result in death; and you further find that, under such belief, she took no steps to seek relief for the deceased, while she would not be technically guilty of murder, (there being no union of act and intention on her part to kill the deceased,) yet I charge you, under such circumstances, she would not be entitled to recover; and in arriving at such a conclusion, you will adopt the usual rule in civil cases in finding in favor of the preponderance of evidence.

Tenth. I am requested by the defendants to charge you, "That if they shall find that Dr. Paterson took the poison by mistake, the mistake originating in a mind enfeebled or beclouded by drink, and leading him to pour out laudanum by a dim gas light, and into a goblet, in such quantity as to produce death, he was guilty of gross negligence, and the plaintiff cannot recover." I decline to charge you, as requested, in that lanugage. But I charge you, that if Dr. Paterson, by voluntary drunkenness and incapacity of mind produced thereby, took a dose of laudanum to destroy life, the same as if committed when sober; for, as drunkenness is no excuse for crime, if he administered to himself, or *any other person, a dose of poison sufficient to produce death, the law would presume that the act was intentional; and, under the law, such an act as that to another person would be considered murder, and, committed upon himself, would be considered suicide.

Eleventh. "That if they shall find that the plaintiff was present when Dr. Paterson, in such condition, and under such circumstances, swallowed the poison, and shall find further. that when the results of the poison grew to be apparent, she failed to call in such medical aid as might have saved his life, she was guilty of gross negligence, and they must bring in a verdict for the defendant." I cannot charge you, as requested, in that language; but I charge as follows: If you shall find that the plaintiff was present when Dr. Paterson took a dose of poison, and shall further find that, when the results of the poison grew to be apparent, and she had reasonable ground to believe that such results would prove fatal, and she failed to call in, in time, such medical aid as might have saved his life, she cannot recover.

Then, in regard to the conspiracy, I charge, if you find from

the testimony that Roher and Mrs. Paterson conspired to take the life of the deceased, then any act or saying of either party tending towards the accomplishment of the act they conspired to perpetrate, whether such act or saying was done or said when they were together or separate, is in law the act of both parties.

Mr. Jackson, of counsel for the defendant: If your Honor will excuse me, the first request—if your Honor will turn to that and read it—I would like your Honor to overrule.

The Court: "That the policy of assurance placed in evidence by the plaintiff is void from the want of such an insurable interest as is required by the law of Georgia, and there can be no recovery upon it."

I have substantially charged that, by saying that (under my construction of the law) if they believe that Paterson and his wife were married under the forms prescribed by the laws of Georgia, then she was his wife. And if they find she is his wife, then this is such an insurable interest as would not void the policy.

*Mr. Jackson: I perceive I am so unfortunate as not to have made myself understood. We deny that a wife can take out a policy in her own name upon her husband's life in Georgia.

The Court: That is not the case at bar.

Mr. Jackson: Undoubtedly; the policy is taken out by Katie A. Paterson upon the life of her husband. It is not taken out by James T. Paterson upon his own life, for the benefit of his wife, as set out in the Code of Georgia; but a policy taken out by her, he acting as her agent, precisely as any other person might act as her agent in the matter. He acted as her agent, being, also, her husband.

The Court: I charge the jury that the policy can be taken out; and if they find she is the wife of Paterson, under the testimony, a recovery can be had so far as to his representing her as his wife.

Mr. Saussy, of counsel for plaintiff: There is one point that we ask your Honor to charge, that if the jury find a verdict for the plaintiff, the plaintiff is entitled to interest upon $10,000 00, from and after the expiration of sixty days from the date upon which the company received proof of loss and notice of death, which was on the 12th day of June, 1868.

The Court: So I charge you, gentlemen.

The jury having retired, subsequently returned for further instructions.

The Court said: Gentlemen, I am informed you desire me to recharge you on the question of drunkenness and suicide. I charged you, before you went out, on that question, that if Paterson, by voluntary drunkenness and incapacity of mind produced thereby, took a dose of laudanum to destroy his life, then, under the law of this State, the effect of his act would

be the same as if committed when sober; so far as drunkenness is no excuse for crime; that is, drunkenness would not excuse him if he administered to himself or any other person a dose of poison sufficient to produce death; the law would presume the act was intentional; and under the law such an act committed on another person would be considered *murder: committed upon himself, it would be considered suicide.

Mr. Hartridge (of counsel for plaintiff): I understand your honor to charge the jury that the taking of the liquor to produce drunkenness must be intentional upon the part of Dr. Paterson, or, in other words, that he intentionally became drunk for the purpose of committing suicide.

The Court: Yes, that is what I mean by voluntary drunkenness; that he took it for the purpose of making himself drunk.

A Juror: That is the case in point.

Mr. Jackson, of counsel for defendant: My construction of the charge is that, if he became voluntarily drunk, and then, as the result of that drunkenness, gave an overdose of laudanum to himself, or to any one else, he was guilty either of murder or of suicide.

The Court: Yes; if he voluntarily took this laudanum for that purpose.

A Juror: That is all that we disagree upon—all that we ask information upon.

The jury again retired and, after a short time, returned with a verdict for plaintiff for $10,000 00 with interest.

Whereupon the defendant moved for a new trial, on the following grounds.

1. Because the Court erred in charging the jury that "the marriage of one already married is valid until a judgment of divorce is granted."

2. In charging the jury that "whatever may have been the criminal consequences to the plaintiff for contracting this second marriage," yet that "if they should find, under the testimony, that Paterson and herself were united in marriage and lived together as man and wife, there was no misrepresentation on the part of Paterson which would avoid the policy."

3. In failing to charge the jury as requested by defendant's counsel in writing, that "any concealments or misrepresentations as to the true character of the relationship" existing between Paterson and the plaintiff "which, in any *wise affected the risk of the insurer, voided the policy, and there could be no recovery upon it."

"That the language of the policy incorporated into itself the application upon which it was based, making all the statements of the latter covenants of warranty upon the part of the plaintiff that they should be in all respects perfectly true; and that, if the evidence shall have shown any mis-

statement whatsoever, or any suppression of a qualifying fact in the application, whether affecting the risk or not, the policy was made void thereby, and they (the jury) must bring in a verdict for the defendant."

4. In refusing to charge the jury as requested by defendant's counsel, "that, if they should find that Dr. Paterson took the poison by mistake, the mistake originating in a mind enfeebled or beclouded by drink, and leading him to pour out laudanum by a dim gas-light into a goblet, in such quantity as to produce death, he was guilty of gross negligence, and the plaintiff cannot recover."

5. In not charging as requested by defendant's counsel in writing, that, "if the jury should be satisfied, from the evidence that there was a conspiracy between the plaintiff and Edward A. Roher, or any other person or persons, to secure the payment of the insurance money, whether by destroying the life of Paterson, or by concealing the real causes, or significant circumstances of that death, or by any act or declaration looking to any circumstances or relationship in life of the plaintiff, whether existing before or after the undertaking by her to contract marriage with Paterson, then all the acts and declarations of such other person or persons looking to that end, are to be regarded as the acts and declarations of the plaintiff herself." . That his Honor erred in limiting his charge upon that point, to conspiracy between Roher and Mrs. Paterson to take the life of deceased.

6. In not charging the jury as requested by defendant's counsel in writing, "that if the jury be satisfied that the plaintiff has been guilty of gross negligence, either by herself or by her agents, she cannot recover upon this policy, even though they (the jury) should recognize no evidence of criminality in her or her agents."

*7. In charging the jury that the plaintiff, Kate A. Paterson, could take out a policy in her own name upon the life of James T. Paterson; in other words, that a wife can take out a policy in her own name, without other insurable interest, upon the life of her husband, under the Code of Georgia.

8. In recharging the jury, (upon the matter of drunkenness on the part of Paterson) at their request, and in responding to counsel in their presence, erred in conveying to the jury the instruction which was conveyed by the dialogue, aforesaid, between the Court, counsel and jurors.

9. Because the verdict is contrary to law.

10. Because it is against the evidence.

The Court refused a new trial, and that is brought up for review, upon the grounds stated in the motion.

Jackson, Lawton & Bassinger, for plaintiff in error. As Talbird, the husband of defendant in error, was living when she married Paterson, her second marriage was "simply

void and a mere nullity:" 4th Blackstone's Com., 163, 164; 4 Johnson R., 52; 1 John's Chan. R., 392; 2 Iredell 355; 5th, 493; 22 Ala., 101, 102. So far as the parties to such void contract was concerned, the law in Georgia remains unchanged. The decision in 27th Georgia stands upon the assumption that "mental incapacity" having been made a ground for divorce, the marriage of one, thus incapacitated, is "a marriage de facto;" to be dissolved only by decree of divorce: 27th Georgia, 106. But the disability of "previous marriage, undissolved," is not, by the Code, a ground authorizing divorces: Code, 1711. And there is no recognized principle which does not forbid such construction, either of Code, or of the judgment, as will derogate further from the Common Law. So, the decision in 34th Georgia must be confined to its subject-matter, the legitimacy of the children: 34th Ga., 416. Placed expressly on the Common Law, when it speaks of the dissolution of the marriage by "judgment," etc., it can be construed to mean only such judgment as the Common Law recognized. Now, by the Common Law, the marriage of a party already married, must be adjudged void *by any Court: 5 Iredell, 493, 494; 16 Com. Law, 425, 429; 20 Com. Law, 449; 63 Com. Law, 193, 204, 205. It is not a marriage de facto; but it is, ipso facto, void: 12 Modern, 532. So far as the Code releases a party, who may contract such marriage, from punishment for bigamy, it is identical with the law of England, of New York, etc.: 4th Blackstone, 164, Note; 4th Kent, 79, 80. To make such marriage legal, then, for aught else than to legitimatize the offspring, further legislation was necessary. There has been such legislation in New York: 4 Kent, p. 80, Note. There has been none such in Georgia. But concealment of facts which affected the insurer's risk, avoided the policy: Code, 2762, 2764. The insurance was mutual; and the Code required the strictest good faith: Bill, p. 3; Code, 2798. Though she might have married Paterson under the belief that Talbird was dead, yet the defendant (and therefore Paterson, her agent) knew that Talbird was living in 1863. She "informed me (Talbird) by letter that she was living with Paterson at that time (1863) as man and wife:" Bill, p. 20. From the Act of 1863, and the testimony of Mr. Barnes, it is clear that they also knew that, in the opinion of the Judiciary Committee, etc., their marriage was void and could not be legalized. "I cannot say that I introduced the bill, but was frequently consulted by Dr. Paterson in reference to it. Possibly the bill was introduced by me. The bill originally contemplated the passage of an Act legalizing the marriage of James T. Paterson and the plaintiff. It was referred to the Judiciary Committee, of which I was a member. It was the opinion of the committee, to the best of my recollection, after deliberation, that the Legislature had no power, under the Constitution, to legalize a marriage otherwise illegal:" Bill, p. 45. And from Tucker's testimony it

further appears that, in 1864, Paterson executed a will (under the influence of defendant) to leave his property mainly to her, thereby "preventing his brother from receiving any of it:" Bill, pp. 16, 17. Said will was unnecessary, had he believed the marriage to be valid. Here, then, were facts which, to say the least of them, qualified the relationship existing between *Paterson and the defendant, at the time he applied for the policy. The condition of the policy made every statement of Paterson a covenant of warranty, that it should be in all respects full, fair, and true. Any misstatement, whether made through fraud or ignorance, whether material to the risk or not, avoided the policy: 6 Cushing, 42, 449; 2 Parsons on Ins., 421; Ellis on Insurance, cap page, 205, 81; 3 Gray, 580; 95 Eng. Com. Law, 437; 24 Eng. Law and Eq., 1, 2, 3. The insured is bound to tell the truth without being interrogated: 17 Penn. State R. (5 Harris,) 253. The family history is not simply a health history; any circumstances touching the insurable interest is embraced in the covenant: 20 N. Y., 32, 33, 34, 37; Ellis on Ins., 223, 224. Who will venture to say that the insurer's risk is not affected by such circumstances as characterized this so-called marriage? What have been the results: Read summary of the evidence, etc. Imperative duty of Court to express an opinion upon the testimony in this case: 31 Ga., 479. The history of life insurance develops the fact that government has been constrained to interpose in order to protect human life from policies, which, in the absence of a bona fide insurable interest are wagering contracts of the most dangerous character: 3 Kent, 368, Mar. Note; 23 N. Y., 516, 526. The same principal should be potent with the Courts. Impossible to assimilate as "insurable interest," the precarious relationship which existed between Paterson and defendant (and which, as the evidence shows, [Bill; p. 27,] he thought he had ended by leaving her) to the usual marital relationship: 2 Peters, 49, 50, et seq; 6 Gray, 448, 449, 452. The Court erred in its final instruction to the jury, that, although Paterson might have taken the poison from the effects of intoxication, yet, to constitute the act suicide, they must find that he took it voluntarily, for the purpose of self-destruction: 31 Ga. R., 475, 472. Drunkenness, destroying the capacity to intend, itself assumes the place of intent. But, if drunkenness does not relieve from responsibility for acts, which, committed by a sober man, would be punished as crimes, still less can it relieve from the consequences, civilly, of what in *a sober man, would be gross negligence: 44 Eng. Com., 351, Note. The following is from Dr. Fish's statement in the "Proofs of Loss;" "Upon examination of the vial shown me by Mrs. Paterson, from which she stated the laudanum had been taken (and which she had purchased for her own use, to relieve a neuralgia from which she occasionally suffered); and the quantity she thought it contained, at the time it was last used by

her, I suppose he, Dr. Paterson, could not have taken less than two or three drachms of that drug:" Bill, p. 24. The taking such a dose by an adult would involve gross negligence, and cannot be justified upon the plea of drunkenness. And the Judge erred in not giving the law as to negligence, together with the law as to drunkenness, in charge to the jury: Code, 2759, 2779. The Court erred in not charging the jury, as requested by defendant below, in regard to the law which makes acts and declarations, if conspirators, evidence against each other: 1 Greenleaf, 111.

Thomas E. Loyd. Hartridge & Chisholm, for defendant. The marriage of James T. and Kate A. Paterson was not void, but voidable, and existed as a marriage until dissolved by the Court. There are no de facto marriages in Georgia which are nullities per se by reason of a cause existing prior to the marriage. A previous marriage creates a disability to contract, and the marriage of a person unable to contract is declared void. But when? When they are annulled and declared void by a competent Court, for until then the issue of the marriage are legitimate: Code, sec. 1701. There is something to be done after the marriage before it is absolutely a nullity, and that is a decision of a Court of competent jurisdiction. And such is the law of Georgia as to the crime of bigamy. The children of the second marriage born before the commencement of a prosecution for bigamy, or within the ordinary time of gestation thereafter, are legitimate: Code, sec. 4457. At the Common Law, the rule is different. No sentence of a Court was necessary to dissolve the second marriage, and the issue were bastards. It is evident that the word "void," as used in the statute means *voidable, for in two of the cases in which the marriage is declared void, to wit, where parties are "unwilling to contract, or are fraudulently induced to contract," it is provided that a subsequent consent and ratification shall render valid the marriage. But that which is absolutely void because in opposition to the law is not susceptible of ratification. That the second marriage in all the cases either remains until annulled or is susceptible of a ratification indicates clearly the intention of the legislature. Under the head of void marriages are placed those in which the parties are unable to contract. Parties unable to contract are, amongst others, persons too nearly related or impotent. Soundness of mind is also required. And yet both relationship and impotency are made grounds of divorce. If it be said that having a prior husband or wife living is not made a ground of divorce, the reply is, that the parties framing the Code probably considered that adultery was made a ground of divorce, and the fact of adultery is necessarily involved in a second marriage, the first husband or wife living. There is no action for the dissolution of marriage in Georgia except by an action of divorce or a conviction for bigamy. The Supreme Court of Georgia has held that, in a case where the marriage was

void at common law by reason of the insanity of one of the parties (which common law was then in force in Georgia) the remedy was an action of divorce: 27 Ga. R., 102, 106, 107. And at the Common Law a prior marriage and incapacity to contract are upon the same footing: 1 Black. Com., Am. p. 436, 437. If in the one instance the marriage can only be annulled by divorce, so it must be in the other. The above course of reasoning is fully sustained by the Supreme Court of Georgia in a decision upon a' statute of the State of North Carolina, which is in the words of the English statute: 34 Ga., 407, 416, 417. A statute of the State of New York makes a marriage contracted when a former husband or wife is living void, but with an exception that, under certain circumstances, the marriage should not be void except from the time it was declared a nullity by a Court of competent jurisdiction: Tyler on Infamy and Coverture, pp. 843, 844. The marriage contracted *under these circumstances is held by the Courts of New York to be voidable and not void: 30 N. Y. Rep., pp. 47, 55; 6 Paige's Ch. Rep., 207. In Georgia, all marriages remain valid until their nullity is pronounced upon by a Court. Though declared void, yet they become so only when pronounced by the Court. They are, therefore, under the New York authorities above cited, voidable and void per se. A voidable marriage continues a marriage until it is dissolved: Bury's case, 5 Coke Rep., 201. The first branch of the third charge asked for and alleged to be refused is covered by the charge given as to the marriage of the defendant in error, as that is the only possible misrepresentation which can be found in the evidence. The second branch of the third charge asked for was properly refused by the Judge: Code of Ga., secs. 2760, 2761, 2762. The charge on the fourth ground was property given by the Court. No person can be said to die by his own hand when his death is the result of mistake or accident. The charge asked for was wrong in another respect, as it would have confined the inquiries of the jury to certain facts in the testimony from which alone the counsel required the court to charge that the jury should bring in a verdict for the defendant: 11 Ga., p. 286. Upon the fifth charge asked for the Court charged correctly. The Court can not be required to charge upon hypothetical cases, and it is not error in the Court to refuse such charges when asked for. The charge requested must arise from and be supported by the facts of the case. There was no. conspiracy of any sort attempted to be proved by the witnesses, and there were "no acts or declarations" of any person proved which ought to have been taken as the "acts or declarations" of the defendant in error, unless it might be claimed as to the witness Roher, and as to him the Judge charged as requested: 12 Ga., 293; 11 Ga., 286. The charge for which error is alleged in the sixth ground was properly given by the Judge. The Court gave its charge as·

called for by the facts of the case upon the only point of the case in which any negligence could by possibility be imputed to the defendant in error: See Bill of Exceptions, p. 149. To the seventh *ground of error, we say that a married woman can insure the life of her husband in Georgia, for her own benefit. A wife has an insurable interest in the life of her husband, and such insurance is not a wagering policy: Bunyon on Life Assurance, m. p. 14; 79 Law Library, t. p. 25; 2 Harrison's Digest, 3845, 3846; 12 Massachusetts, 115; 6 Gray, 396; 7 Ohio, N. S., 292. By the Act of 1866, a married woman is in effect a feme sole as to all property acquired by her after the passage of the Act: Acts 1866, p. 146. The Act of 1866 refers to marriages past and future, and is not unconstitutional as to marriages contracted prior to the Act: 40 Miss. R., 154, 169; 12 S. and M., 347. And there is no inhibition in the Code of Georgia against such an insurance. . But, looking to all the facts in this case, and especially the fact that the husband acted as the agent of the wife in obtaining the policy, is it not in effect an insurance by the husband for the benefit of his wife, and as such, directly within the provisions of the Code? Code, sec. 2778. The policy was issued by the company, and they, by their own act are estopped from saying that they had no right to issue such a policy. They have received and retained the premium, and it is fraudulent, on their part, now to claim that they issued an illegal and worthless policy. They are estopped from so doing: 2 Smith L. C., t. p. 479. The whole printed part of the policy furnished and issued by the Company to the defendant in error shews, that it was the habit of the company to issue policies in this form. The receipt from the wife is printed in the form, and there is further printed in the policy that it is a policy "for wife." The eighth ground of error, as to the recharge of the Court, can not be sustained. The death of a party by his own hand does not vitiate the policy of insurance, unless the party intended to take his life: Guy's Medical Jurisprudence, p. 229; 4th Allen, 103; 5 M. and Granger, 338, 344. The complaint that the verdict is contrary to evidence cannot be sustained according to the current of Georgia decisions, for the verdict is not "decidedly and strongly against the weight of evidence: Code of Ga., sec. 3666. All the other grounds of error alleged relate to *the charge of the Court. The correctness of the charge must be determined by taking the whole together; and if taking the instructions collectively, the law seems to have been properly expounded to the jury, the judgment will not be reversed, though some one opinion may be erroneous: 11 Ga., 337. The court is not bound to charge the jury as to a principle of

law, which, although a sound principle, does not grow out of the case; nor is it error: 12 Ga., 271, Code, sec. 3664; 14 Ga., 137. It is not error in the Court to decline to give a charge to the jury not warranted by the facts of the case: 13 Ga., 406. Viewed in the light of these principles, the charge of the Court in the present case, was substantially correct, and the refusals to charge proper: See Charges and Exceptions. Even if the charge or refusals are erroneous, if justice has been done, no new trial should be granted in the case at the present term. Defendant in error was married to Dr. Paterson in 1860, by a person authorized by law to perform the ceremony, under license, and under the belief on her part and that of Dr. Paterson, that her first husband, Dr. Talbird, was dead. When the policy of insurance was taken out in February, 1867, both were still under the belief that Talbird was dead: See evidence. Application for insurance can only be used as evidence of misrepresentation in a Court of Law: 8 Wend., 160. The kind of misrepresentations of concealments, which, by the law of Georgia, make a policy of insurance void, must be willful misrepresentations or concealments, and such as change the nature, extent or character of the risk: Code, sections 2760, 2762, 2764. Difference between bigamy at Common Law and by statute of Georgia. In Georgia knowledge of prior husband or wife living necessary: See Code. Whether the misrepresentation or concealment be wilful or not, is a question for the jury to decide; and unless their verdict be strongly and decidedly against the weight of evidence on this point, it will not be disturbed: Ellis on Ins., Note, 90; 12 John, 515; 1 Peters, 188; 2 Peters, 25; 16 Peters, 495. But we submit there was no misrepresentation or concealment affecting the risk, wilful or otherwise. Mrs. Paterson was the wife of Dr. Paterson at *the time of insurance, so far as the purposes of the insurance were concerned, by the law of Georgia; and it is entirely to this purpose of insurance that the charge of the Court in reference to marriage was intended. to apply. Marriage, where prior husband or wife living, is a marriage de facto, and prima facie valid even in England, where children are not protected from illegitimacy: Poynter on Marriage and Divorce, Law Library, xiii, top pp., 50 and 55. Suits for nullity of such second marriage entertained: Same authority Prior husband or wife living at time of second marriage cause of divorce: Shelford on Marriage and Divorce, 193, 191, xxxiii Law Library. In Georgia, offspring legitimate until marriage dissolved by Court of competent jurisdiction: Code, sec. 1701. Hence marriage is de facto until annulled. In Georgia, prior marriage cause of divorce of second marriage up to 1850: 2 Kelly, 205. In that case pre-contract is laid down as one of the grounds of Divorce; and pre-contract was and is marriage by law of Georgia and of England: 1 How., 221; 4th Comstock's Reps., 238, 243; Poynter on Mar. and Div., 5. Marriage con-

tract in Georgia, good without any forms, and was prior to 1850; all that was necessary was for the parties to speak words of contract in presence of witnesses: 30 Georgia Reps., page 176. Now prior marriage not ground for divorce in Georgia, but still requires sentence of some competent Court to annul before effects of second marriage as null, can apply to third parties: 2 Kelly; 10 Ga.; 27 Ga.; 34 Ga. 414; 4 John Ch. R., 343, etc.; 2 Kent's Com., 83. "Suicide," or "death by his own hands," to make the policy void must be a criminal act of self-destruction: 4 Hill (N. Y.) 74; Ellis on Ins., Note, p. 198.

McCAY, J.

The law prohibiting the insurance of a life by another, who has no interest in the continuance of that life, is founded in a sound public policy. It is intended to prevent gaming policies, and to avoid that inducement to crime which would exist if it were permitted: Bunyon on Life Ins., 10, 15; Rev. Code, sec. 2776.

364 *We do not think, however, the case at the bar comes within the reason of the rule. We cannot, it is true, agree with the Court below, that a marriage, where one of the parties has a lawful husband or wife living, is a legal marriage for all civil purposes, until it is set aside. Our Code, sections 1698 and 1701, declares such a marriage void. Nor is it by our law a ground of divorce. At any rate it is not among the grounds enumerated in section 1711 of the Code. Whether our Courts might not entertain a proceeding to have such a marriage declared void, it is not necessary to discuss.

It is true, that under our law, whilst such a marriage is void "the children born before the commencement of a prosecution are legitimate, notwithstanding the invalidity of such marriage: Revised Code, section 4457. It is true, also, that a man holding out a woman as his wife is bound for her acts as though she were his wife. But this holds even if there be in fact no marriage. The most that can be said is that, for some purposes, the law treats the marriage as existing. But these are purposes referring to the rights of others, and not to the rights of the parties themselves.

As respects the parties and their rights, we do not know of a particular in which such a marriage is otherwise than void. Surely the wife is not entitled to dower and a year's support, etc., etc.

By the Common Law, a marriage between two persons, when one was under a previously undissolved marriage, is absolutely void and thus did not require a sentence of divorce: Shelford 223, and cases cited. Certain canonical disabilities rendered a marriage voidable—as consanguinity, affinity, bodily infirmity, etc. In these cases, a sentence declaring the marriage void was necessary: Shelford, 223. To this

class may, perhaps, be added pre-contract: Case of Anne Boleyn.

But impediments to marriage, such as idiocy, former marriage, etc., which existed at law, made the marriage void: Poynter on Marriage, 84.

The existence in England of two Courts—Ecclesiastical and Common Law—one administering the cannon and the other *the Common Law, kept these distinctions very clear. Here, where we administer, by 'one Court, both laws, it is necessary to preserve the distinction, since it is founded in the nature of things, and in the law of morals.

But though such a marriage is void, and may be so treated in any Court where the facts are made apparent, we do not see that it follows that a policy of insurance, effected by the husband on his own life, in the wife's name and for her benefit, is void.

We do not think such a policy comes within the reason of the law prohibiting gaming policies, nor that it is open to the other objection, that it offers inducement to crime. In this case, though the marriage was illegal, yet in fact the woman had an interest, and a deep interest, in the life of the husband. He treated her as his wife. He supported her as such, she passed in society as such, and she was dependent upon him for support as such. It was the husband who in fact effected this policy. It was his own method of extending to this woman his assistance and protection, after he should himself be dead. Here is no gaming, since the very person whose life is insured is himself the actor in the transaction. So, too, as to the temptation to crime, offered to the beneficiary of the policy. It would seem, when the person whose life is insured is himself the actor in the matter, the amount of temptation held out to others to take his life, may, as a general rule, at least, be left to his discretion.

In Massachusetts (12 Massachusetts, 115) it has been held that a sister may insure the life of her brother, if she be actually dependent upon him. And the New York cases: 22 Barbour, 39; and 20 New York, 32; established that an insurance affected by one on his own life, for the benefit of a third person, (and that is in substance this case) is good. Since the idea of wager in such a case is absurd.

Our statute merely requires the person insuring to have an interest: Code, section 1776. Another section of the Code, 2778, expressly permits the insured to direct the money to be paid to his assignee, and if he may do this, we do not see *that an insurance effected by him, as the assured of another, for that other's benefit, is not equally good. We do not think, therefore, that this policy is void simply because the marriage was illegal.

But the utmost good faith is required in such cases. The applicant is bound to state every material fact in his knowl-

edge. Sections 2671 and 2672 of our Revised Code, and 2670 of the same, contains these distinct propositions: 1st, That any variation from the truth by which the nature, extent, or character of the risk is affected, will avoid the policy. 2d, If the party acts bona fide, and states what he thinks is the truth, this does not make the policy void, but the wilful concealment of a fact which enhances the risk, does do so.

To apply these principles to this case, it is clear to us that the Court erred in his charge to the jury. He told them that Paterson's failure to inform the company of the true relations between himself and the defendant in error, was not such a false representation as avoids the policy. We think this depends entirely on whether Paterson knew at the time what the true relations were; if he did not know, then he acted bona fide, and under section 2761 of the Code the policy is good. But if he did know and kept back the truth, then, under section 2762 of the Code, the policy is bad.

We think the legality of the supposed marriage was a material fact. It affected the character of the risk. No man, observant of human conduct, can fail to have noticed that disturbance in one's marital relations is, of all things, most calculated to create mental and physical unhealthiness, and no prudent company would be so ready to take the risk of a man's life, whose condition was that of Paterson, as it would had the marriage been legal.

The history of these parties is itself a striking commentary of the idea we intend to convey. Very clearly, Mrs. Paterson, as she is called, knew that her last marriage was illegal, and, very clearly, her knowledge of the looseness of the tie that bound her to Paterson, influenced her conduct, in her relations to him, and in her daily association with others; *add to this the impending fear of discovery, social ostracism, and the consciousness that, at any moment, as with a petard, the whole fabric of her present domestic relations was subject to be scattered to the winds; and, under such circumstances, it is surely true that there are many influences unfriendly to health, and many conducive to the formation of habits, and the indulgence in practices calculated to shorten life.

We do not say that Paterson was aware of the illegality of the marriage, that is for the jury to determine on the proof. What we mean is, that if he was aware of it and concealed it, he kept from the company facts entering materially into the nature and extent of the risk, and that concealment, wilful and intentional as it was, and of facts contrary to the truth of the case, avoids the policy.

Very clearly, to our minds, a death by accident does not come within the description of dying by one's own hand. There must be an intent to commit suicide. Even though it be but the intent of a drunken man, however, it is none the less an intent.

We think, taking all the charge together, the Court properly put the law upon this point to the jury, though it was somewhat obscured by the mode in which the charge was made. An accident, even though it be the result of that loss of perception produced by drink, cannot fairly be called the product of intent. But if the intent in fact exists, the other fact, that the man was maudlin from drink, and could have no very intelligent conception of his surroundings, does not help the case; since the drunkenness is his own act, and society would be in great danger if one could escape the consequences of his acts by the plea of drunkenness.

Judgment reversed.